# IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
PINE BLUFF DIVISION

TERRICK TERRELL NOONER,                                             PLAINTIFF

     and

DON WILLIAMS DAVIS                                  INTERVENOR  PLAINTIFF

     and

JACK HAROLD, JONES, JR.                             INTERVENOR PLAINTIFF


No. 5:06CV00110 SWW
VS.

LARRY NORRIS, Director,
Arkansas Department of Correction, et al.                           DEFENDANTS


*consolidated with*

FRANK WILLIAMS, JR.                                                PLAINTIFF


No. 5:07CV00173 SWW
VS.

LARRY NORRIS, Director,
Arkansas Department of Correction, et al.                           DEFENDANTS


## ORDER

    Four Arkansas death row inmates bring this action under 42 U.S.C. § 1983, challenging

the constitutionality of the State's protocol for execution by lethal injection.  Before the Court is

(1) Defendants' second motion for summary judgment (docket entries #128, #129, #130),

Plaintiffs' response in opposition (docket entries #135, #137, #138, #139), and Defendants' reply (docket entry #140). Also before the Court is Defendants' motion to lift the stay of execution of Plaintiff Davis's death sentence (docket entry #131), Davis's response in opposition (docket entry #136), and Defendants' reply (docket entry #141). After careful consideration, and for the reasons that follow, summary judgment will be entered in Defendants' favor, and Davis's stay of execution will be dissolved.

## I.

On May 1, 2006, Plaintiff Terrick Terrell Nooner ("Nooner") commenced this action, claiming that the State's lethal injection protocol presents an unnecessary risk of conscious suffering and extreme pain, amounting to cruel and unusual punishment prohibited under the Eighth Amendment. The Court permitted Don William Davis ("Davis") to intervene as party plaintiff, and thereafter Governor Mike Huckabee scheduled Davis's execution. The Court granted Davis a stay of execution in order to permit him to litigate his challenge to the lethal injection protocol. Defendants appealed the stay, and while that appeal was pending, the Court permitted Jack Harold Jones to intervene as a party plaintiff. Additionally, the Court consolidated with this case a separate action filed by Frank Williams, Jr., also challenging Arkansas' lethal injection protocol.

On July 9, 2007, the Eighth Circuit vacated Davis's stay of execution, concluding that this Court applied the incorrect standard for determining whether Davis had unnecessarily delayed bringing his claim. Governor Mike Beebe scheduled execution dates for Nooner and Jones, and both inmates moved for a stay of execution in this case. Nooner also moved for a stay of execution in a separate habeas proceeding.

2

On September 10, 2007, United States Chief District Judge J. Leon Holmes granted Nooner a stay of execution for the purpose of allowing him to pursue a claim joined in the aforementioned habeas proceeding.  On September 11, 2007, this Court denied Nooner's and Jones's motions for stays filed in this case, finding that in light of the Eighth Circuit's opinion in *Taylor v. Crawford,* 487 F.3d 1072 (8th Cir.2007), Plaintiffs have little chance of success on the merits.  The Court also found that Nooner and Jones unnecessarily delayed bringing their claims.

Jones and Nooner appealed from the order denying their motions for stays in this case,[1] and Jones petitioned the Eighth Circuit for a stay of execution.  In support of his motion, Jones cited the United States Supreme Court's grant of certiorari in *Baze v. Rees*, 217 S.W.3d 207 (Ky. 2006), *cert. granted*, – U.S.—, 2007 WL 2850507 (U.S. Oct. 3, 2007), a case involving an Eighth Amendment challenge to Kentucky's lethal injection protocol.   Jones also argued that, even under existing law, this Court abused its discretion in denying his motion for a stay.  *See* Appellant's Motion for Stay of Execution , *Jones v. Norris*, No. 07-3165 (8th Cir. Sept. 30, 2007).

On October 11, 2007, the Eighth Circuit entered a one-sentence order granting Jones's motion for a stay of execution.  The State filed an application with the Supreme Court to vacate the stay, and the Supreme Court entered a one-sentence order denying the  application.

While Jones's application for a stay of execution was pending before the Eighth Circuit, Governor Beebe set Davis's execution for November 8, 2007.  On October 22, 2007, Davis filed a motion for a stay of execution in this case.  Finding no rational basis for granting a stay of

---

[1]On July 23, 2008, the Eighth Circuit consolidated Plaintiffs' separate appeals.  *See* Order Granting in Part Motion to Consolidate, No. 07-3165 (8th Cir. July 23, 2008).

3

execution for Jones and denying the same for Davis, the Court granted Davis's motion for a stay.

On November 9, 2007, the Court stayed all proceedings in this case pending the Supreme Court's decision in *Baze,* and on November 14, 2007, the Eighth Circuit stayed Jones's and Nooner's appeal pending the Supreme Court's decision in *Baze* and ruling on a petition for certiorari in *Taylor v. Crawford*, 487 F.3d 1072 (8th Cir. 2007).

On April 16, 2008, the Supreme Court issued its decision in *Baze*, upholding Kentucky's lethal injection protocol, see *Baze v. Rees, — U.S. —, 128 S.Ct. 1520 (2008 )*, and on April 21, 2008, the Supreme Court denied certiorari in *Taylor v. Crawford*. *See Taylor v. Crawford,* 487 F.3d 1072 (8th Cir.2007), *cert. denied,* 128 S. Ct. 2047 (2008).  On May 21, 2008, the Court reopened this case, and on May 22, 2008, the Eighth Circuit vacated the stay of proceedings in Nooner's and Jones's appeal of this Court's decision to deny their motions for stays.

## II.

Since 1983, Arkansas' lethal injection statute has provided that the "punishment of death is to be administered by a continuous intravenous injection of a lethal quantity of an ultra-short-acting barbiturate in combination with a chemical paralytic agent until the defendant's death is pronounced according to accepted standards of medical practice."  Ark. Code Ann. m§ 5-4-617(a)(1).  Arkansas law gives the Director of Arkansas Department of Correction ("ADC"), Larry Norris ("Norris"), the responsibility to determine the substances to be administered and the procedures to be used in any execution.  *See* Ark. Code Ann. § 5-4-617(a)(2).

Arkansas' lethal-injection protocol calls for the administration of three chemicals, each followed by a saline flush, in the following amounts and order: (1) 3 grams of sodium thiopental, administered to cause unconsciousness; (2) 100 milligrams of  pancuronium bromide,

administered to cause paralysis; and (3) 240 milliequivalent of potassium chloride, administered to stop the heart. Injections are administered by way of injection devices located in a control room that is separated from the execution chamber by a wall that contains an observation window. The injection devices are connected, by extension tubing, to intravenous ("IV") catheters inserted into each arm, or other anatomical venous points of entry, of the condemned inmate. The catheters are inserted by an IV team, and the injections are administered by executioners.

Since the initiation of this lawsuit, Norris has twice amended the ADC's lethal injection protocol in an effort to reduce what he considers a minimal possibility that a condemned inmate would experience unnecessary pain during an execution and to reduce existing practices to writing. *See* docket entry #74, Attach. #1 (July 16, 2007 Norris Dec.), docket entry #129, Attach. #1 (May 27, 2008 Norris Dec.).

 The current protocol, like the original, makes the ADC Deputy Director for Health and Correctional Programs ("Deputy Director"), or his designee, responsible for carrying out or supervising several aspects of the procedure. The protocol states: "Unless otherwise stated, the Deputy Director, or the designee, shall be healthcare trained, educated, and/or experienced in matters related to the establishment and monitoring of IVs, the mixing and administration of lethal chemicals, and assessing the presence or absence of consciousness." (ADC Administrative Directive 08-28, Attach. C, Sec. I.1.) The protocol provides that members of the IV team must be  certified or licensed individuals--emergency medical technicians ("EMT's"), nurses, physician assistants, or physicians--with at least two years of professional experience.

Regarding the preparation of lethal chemicals, the protocol provides that the Deputy

Director, or the designee, "shall verify as to type and concentration, and thereafter supervise the

mixing or reconstituting of the [lethal-injection] chemicals in such a manner as will meet lethal

injection requirements[2] and in accordance with manufacturer's instructions." (ADC

Administrative Directive 08-28, Attach. C, Sec. I.2.)  The mixed chemicals are then transferred

to syringes labeled with numbers that correspond to the order in which they are administered.

The syringes are placed in box, which is secured and conveyed to the Cummins Unit.  The

protocol provides that the Deputy Director, or designee, "shall maintain personal, physical

custody of the lethal injection drug box and physically convey the box to the Cummins Unit for

secure storage in the institutional vault until such time as it is delivered to the execution chamber

for use." (ADC Administrative Directive 08-28, Attach. C, Sec. I.3.)

---

[2]Section IV of the amended protocol identifies the contents of the lethal injection drug
box, denoting the administration sequence and chemical makeup of each chemical used in the
procedure as follows:

| SYRINGE LABELED/ MARKED | CONTENTS |
|---|---|
| #1/#2 | Sodium Pentothal, 3.0 grams (two (2) syringes of 1.5 grams in 60 cc) |
| #3/#6 | Normal Saline, 50 cc each |
| #4/#5 | Pancuronium Bromide, 100 mg (two (2) syringes of 50 mg in 50 cc) |
| #7/#8 | Potassium Chloride,  240 mEq (two (2) syringes of 120 mEq in 60 cc) |
| Back up syringes: | |
| #B1/B2 | Sodium Pentothal, 3.0 grams (two (2) syringes of 1.5 grams in 60 cc) |
| #B3 | Normal Saline, 50 cc |

On the evening of the execution, the executioners, under the supervision of the Deputy Director or his designee, enter the injection room prior to the execution and inventory the lethal injection drug box to ensure that all lethal chemicals are accounted for and that infusion devices are ready.

Prior to the time set for execution, the condemned inmate is removed from a holding cell, strapped to a gurney, and transported to the execution chamber.  The Deputy Director or his designee affixes cardiac monitor leads to the condemned inmate, and the gurney is positioned in manner that allows  the Deputy Director or his designee and the executioners to directly observe the condemned inmate's face and IV infusion sites.

Section II of the protocol covers the IV set-up procedure and provides that the  Deputy Director, or his designee, shall have the IV team place  an IV infusion device (catheter) in each arm, or other standard anatomical venous point of entry, of the condemned inmate.   After insertion of IV lines, an IV setup is inserted into the outlet of a bag of infusion medium containing dextrose 5 percent normal saline solution (D5NS).  Two set-ups are prepared in this manner.  Next, tubing for both set-ups is connected to the receiving port of 2, 3-way injection devices located in the control room.  Tubing is then connected to discharge ports on the injection devices and connected to the IV insertion cites, and the tubing is cleared of air and made ready for use.

Once infusion of D5NS has been assured, the IV devices are secured.  The IV sets run at a slow rate and are ready for the insertion of syringes containing the lethal chemicals.  The amended protocol requires that the Deputy Director, or his designee, "shall ensure that the cardiac monitor is 'on' and functioning properly and maintain observation of IV infusion(s) to

7

ensure that the rate of flow is uninterrupted."  (ADC Administrative Directive 08-28, Attach. C,

Sec. II.7.)  The amended protocol mandates: "NO FURTHER ACTION shall be taken until the

prearranged signal to start the injection of lethal chemicals is given by the Warden."  (ADC

Administrative Directive 08-28, Attach. C, Sec. II.7.)

In the event that a patent IV infusion site cannot be established, the amended protocol

requires the following action:

> [T]he IV Team shall be directed by the Deputy Director, or designee, to evaluate
> other possible infusion sites. All effort will be made to establish two (2) unrelated
> intravenous infusion sites.  If one (1) patent infusion site is established, and a second
> site proves to be a futile effort, the Deputy Director, or designee, may direct the IV
> Team to suspend further action.  In the case that no patent infusion site is established
> after reasonable attempts as determined by the IV Team, the Deputy Director, or
> designee will direct the IV Team to suspend further action and thereafter summon
> trained, educated, and experienced person(s) necessary to establish a primary IV
> line as a peripheral line or as a central venous line.

(ADC Administrative Directive 08-28, Attach. C, Sec. II.8.)

The amended protocol provides:

> **EVERY EFFORT WILL BE EXTENDED TO THE CONDEMNED
> INMATE TO ENSURE THAT NO UNNECESSARY PAIN OR
> SUFFERING IS INFLICTED BY THE IV PROCEDURE. STANDARD
> PRACTICE OF USING A LOCAL ANESTHETIC WILL BE
> ACCOMMODATED AS NECESSARY.**

Section III of the protocol covers the injection procedure and provides that the 3-way

injection device facilitates the movement of  fluid from the D5NS bag and allows introduction of

lethal chemical. A valve directs which fluid enters the IV set up. When the signal to commence

is given by the Warden, the executioners administer the lethal chemicals under the direction of

the Deputy Director, or his designee, as follows:

> a.   Syringe #1 (containing sodium thiopental) shall be inserted into the
> designated receiving port of the 3-way control device.

8

b. The flow of IV solution will be interrupted by moving the 3-way valve assembly towards the IV solution receiving port.

c. The contents of Syringe #1 shall commence with a steady even flow of the lethal chemical. Only a minimum amount of force will be applied to the syringe plunger.

d. When the contents of Syringe #1 have been injected, the three-way valve assembly will be moved so as to shut off the infusion of lethal chemical and resume infusion of IV solution.

e. Syringe #1 will be replaced by Syringe #2 and the procedure described in subparagraphs a-d for Syringe #1 will be repeated. This process will be repeated for all subsequent syringes.

Following the administration of the first three syringes (2 injections of 1.5 grams of sodium thiopental, followed by a saline flush) the Deputy Director or his designee "will assess and monitor the condemned inmate's lack of consciousness by using standard procedures as taught in basic life support or CPR courses, such as checking for movement, opened eyes, eyelash reflex, and response to verbal commands and physical stimuli."  (ADC Administrative Directive 08-28, Attach. C, Sec. III.2.f.).  Once the Deputy Director or his designee determines that the condemned inmate is unconscious, and at least three  minutes have elapsed from starting Syringe #1, all remaining chemicals will be administered to the unconscious inmate in numerical sequence, Syringe #4 through Syringe #8.

The protocol provides that if the Deputy Director determines that the condemned inmate remains conscious following the administration of Syringe #3, the back-up syringes of sodium thiopental and a repeat normal saline wash shall be administered into the secondary or alternative IV line.  Thereafter, once the Deputy Director, or his designee, determines that the condemned inmate is unconscious, and at least three minutes have elapsed from starting Syringe #B1, all remaining chemicals will be administered to the unconscious inmate in numerical

9

sequence into the secondary or alternative IV line; Syringe #4 through Syringe #8.

The protocol requires that a cardiac monitor be used to display heart function. When all lethal chemical syringes have been administered, and a flat-line is observed for a minimum of three to five, three-second sweeps on the cardiac monitor, the Coroner shall be summoned for purpose of pronouncing death.

Throughout the infusion process, the Deputy Director or his designee "will closely monitor the infusion site for evidence of infiltrate, vein collapse, or other challenge to the patency of the infusion site." (ADC Administrative Directive 08-28, Attach. C, Sec. III.2.i.) If a problem is suspected, the Deputy Director, or his designee, will direct reduction of lethal chemical flow rate or redirect chemical to secondary site.

The amended protocol requires the following actions when an infusion site is suspected to be compromised: First, the chemical flow rate will be reduced. If problem persists, the administration procedure will be ceased; the curtain to death chamber will be closed; the IV Team will be summoned, and infusion site problem corrected. If all efforts to re-establish patent infusion site fail, the Deputy Director or his designee will direct the IV Team to suspend further action and a "trained, educated, and experienced person [or persons]" necessary to establish a primary IV line as a peripheral line or as a central venous line will be summoned to facilitate an IV infusion site. (ADC Administrative Directive 08-28, Attach. C, Sec. III.2.i.) When the infusion compromise is corrected, the IV Team and the summoned person(s) will be excused, the curtain reopened, and the lethal injection procedure continued.

### III.

The parties agree that unless thiopental is properly administered, a condemned inmate

10

will suffer pain upon administration of potassium chloride, and will be unable to demonstrate his

suffering because of the paralyzing effect of pancuronium bromide.  Plaintiffs do not dispute that

proper administration of 3 grams of sodium thiopental will ensure that they feel no pain after the

administration of pancuronium bromide and potassium bromide.  However, they contend that

Arkansas' protocol subjects them to cruel and unusual punishment because inadequate

procedures, poor facilities, and unqualified personnel create a substantial risk that injections of

sodium thiopental will not be successfully delivered, and they will feel the agonizing effects of

the final two chemicals.  Plaintiffs also assert that the protocol subjects them to painful venous

access procedures.

Defendants assert that pursuant to the standard set forth in *Baze v. Rees* and the Eighth

Circuit's opinion in  *Taylor v. Crawford,* Arkansas' lethal injection protocol passes examination

under the Eighth Amendment, and they are entitled to summary judgment.[3]  In *Taylor v.*

*Crawford,* 487 F.3d 1072 (8th Cir.2007), *cert. denied,* 128 S.Ct. 2047 (2008),  the Eighth Circuit

---

[3]Summary judgment is appropriate when "the pleadings, depositions, answers to
interrogatories, and admissions on file, together with the affidavits, if any, show that there is no
genuine issue as to any material fact and that the moving party is entitled to judgment as a matter
of law." Fed. R. Civ. P. 56(c).  As a prerequisite to summary judgment, a moving party must
demonstrate "an absence of evidence to support the non-moving party's case." *Celotex Corp. v.
Catrett*, 477 U.S. 317, 325 (1986).  Once the moving party has properly supported its motion for
summary judgment, the non-moving party must "do more than simply show there is some
metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574, 586 (1986).

The non-moving party may not rest on mere allegations or denials of his pleading but
must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Id.* at
587 (quoting Fed. R. Civ. P. 56(e)).            "[A] genuine issue of material fact exists if: (1)
there is a dispute of fact; (2) the disputed fact is material to the outcome of the case; and (3) the
dispute is genuine, that is, a reasonable jury could return a verdict for either party." *RSBI
Aerospace, Inc. v. Affiliated FM Ins. Co.*, 49 F.3d 399, 401 (8th Cir. 1995).

upheld Missouri's lethal injection protocol.  The Court emphasized that the proper focus when evaluating an execution protocol under the Eighth Amendment is not the risk of accident, but "whether the written protocol inherently imposes a constitutionally significant risk of pain." *Taylor*, 487 F.3d at 1080.  The Court stated:  "If [a] protocol as written involves no inherent substantial risk of the wanton infliction of pain, any risk that the procedure will not work as designated in the protocol is merely a risk of accident, which is insignificant in our constitutional analysis." *Id.* (citing *Louisiana ex rel. Francis v. Resweber*, 329 U.S. 459, 464 (1947)).

Missouri's protocol uses the same three-chemical sequence as prescribed by Arkansas' protocol, but Missouri requires a 5-gram dose of sodium thiopental.  Although the ADC's protocol calls for only 3 grams of sodium thiopental, Plaintiffs' expert,  Mark J. S. Heath, an anesthesiologist, acknowledges that 2 grams of sodium thiopental, if properly administered, would be more than sufficient to cause unconsciousness.  (6/11/2006 Heath Dec. ¶ 26.)

Missouri's protocol requires that a physician, nurse, or pharmacist prepare the lethal chemicals, which are injected by non-medical employees.  Arkansas' protocol requires that the person supervising the preparation of lethal chemicals, the Deputy Director or his designee, be trained, educated, or experienced in matters related to mixing of lethal chemicals and that he or she ensures that the manufacturer's instructions are followed.  *See Baze*, 128 S. Ct. at 1533(approving similar guidelines regarding the mixing and reconstitution of lethal chemicals).

The Missouri and Arkansas protocols both require that IV insertions be accomplished by medical personnel–a physician, nurse, or EMT.   Both protocols require confirmation, following administration of thiopental, of the condemned inmate's lack of consciousness.  Both protocols call for administration pancuronium bromide and potassium chloride only after it is determined

12

that the inmate is unconscious, and only after the expiration of three minutes from the time administration of sodium thiopental begins.  Arkansas' protocol further requires that throughout the infusion process, the Deputy Director or his designee shall closely monitor the infusion site for evidence of problems.  Both protocols provide for back-up syringes of sodium thiopental, to be administered though the secondary or alternative IV line if needed.  Both protocols provide that if a peripheral IV site cannot be established, a peripheral or central venous primary IV line will be establish by a person with the training, education, and experience necessary for the procedure.

The Eighth Circuit concluded that the only inherent risk in Missouri's written procedure came from the risk of inadequate anesthetization.  However, the Court concluded that Missouri's protocol, which this Court finds to be substantially similar to Arkansas', "renders any risk of pain far too remote to be constitutionally significant."  *Taylor*, 487 F.3d at 1085.

In *Baze v. Rees*, 128 S.Ct. 1520 (2008 ), the Supreme Court upheld Kentucky's lethal injection protocol against an Eighth Amendment challenge.   Kentucky's protocol, like Arkansas', involves the injection of 3 grams of sodium thiopental, followed by injections of pancuronium bromide and potassium chloride.  The protocol mandates that members of the IV team, who site and insert the IV lines, be certified medical assistants, phlebotomists, EMT's, paramedics, or military corpsmen with at least one year of  professional experience.  The protocol further requires that the execution team, including the IV team, participate in 10 practice sessions per year, which includes a walk through of the execution procedure and siting IV catheters into volunteers.

Under Kentucky's protocol, the IV team has up to one hour to establish both primary and

secondary peripheral intravenous sites in the arm, hand, leg, or foot of the inmate.  Kentucky's execution facilities, similar to Arkansas', consist of an execution chamber and a control room, separated by a one-way window.  *Id.* at 1528.  The lethal drugs are administered remotely from the control room through IV tubing.  *Id.*  If the warden and deputy warden, who are positioned in the execution chamber with the prisoner, determine through visual inspection that the prisoner is not unconscious within 60 seconds following the delivery of the sodium thiopental, a new 3-gram dose of thiopental is administered before injecting the pancuronium bromide and potassium chloride.  *Id.*  Additionally, the warden and deputy warden watch for signs of infiltration or problems with the IV catheters or tubing.  *Id.* at 1534.

 In a plurality opinion announcing the judgment of the Court, Chief Justice Roberts began by recognizing that capital punishment is constitutional, and "[i]t necessarily follows that there must be a means of carrying it out."  *Baze*, 128 S. Ct. at 1529.   He noted that  "[s]ome risk of pain is inherent in any method of execution-no matter how humane-if only from the prospect of error in following the required procedure," and "the Constitution does not demand the avoidance of all risk of pain in carrying out executions."  *Id.*

According to the standard set forth in the plurality opinion, to constitute cruel and unusual punishment prohibited under the Eighth Amendment, an execution method must present a "substantial" or "objectively intolerable" risk of serious harm.  *Baze*, 128 S. Ct. at 1531.   The plurality acknowledged that failing a proper dose of sodium thiopental, a condemned inmate would experience suffocation from the administration of pancuronium bromide and pain from the injection of potassium chloride.  *Baze*, 128 S.Ct. at 1533.   However, a risk of future harm qualifies as cruel and unusual punishment only if the conditions presenting the risk are "'*sure or*

*very likely* to cause needless suffering and give rise to *sufficiently imminent* dangers.'" *Baze,*

*128 S. Ct. at 1530-31* (citing *Helling v. McKinney,* 509 U.S. 25, 33,  34-35, 113 S. Ct.

2475(1993)).  In light of built-in safeguards included in Kentucky's written protocol, particularly

the requirement that members of the IV team have at least one year of professional experience,

the plurality concluded that any risk of pain and suffering during administration of the final

chemicals was not so substantial or imminent as to amount to an Eighth Amendment violation.

*Baze,* 28 S.Ct. at 1534.

      Speaking to whether the plurality's standard would resolve cases involving challenges to

three-drug protocols used in other states, Chief Justice Roberts stated:

> A stay of execution may not be granted on the grounds asserted here[4] unless the
> condemned prisoner establishes that the State's lethal injection protocol creates a
> demonstrated risk of severe pain.  He must show that the pain is substantial when
> compared to the known alternatives.  A state with a lethal injection protocol
> substantially similar to the protocol we uphold today would not create a risk that
> meets this standard.

*Baze,* 128 S. Ct. at 1537.

      Defendants assert that Plaintiffs are unable to demonstrate that they are under a

---

    [4]Like Plaintiffs, the condemned inmates who challenged Kentucky's protocol in *Baze*
admitted that proper administration of sodium thiopental eliminates any meaningful risk that a
prisoner would experience pain from the subsequent injections of pancuronium bromide and
potassium chloride, but they claimed that a significant risk existed that the sodium thiopental
would not be properly administered and they would experience intense pain and suffering after
administration of pancuronium bromide and potassium chloride.   The solution proposed by the
petitioners in *Baze* was elimination of pancuronium bromide and potassium chloride, and
additional monitoring by trained personnel to ensure successful delivery of sodium thiopental.
The *Baze* plurality observed that if an Eighth Amendment violation could be established based
merely by showing a marginally safer alternative, it "would threaten to transform courts into
boards of inquiry charged with determining 'best practices' for executions, with each ruling
supplanted by another round of litigation touting a new and improved methodology."  *Baze,* 128
S. Ct. at 1531.

substantial or objectively intolerable risk of harm because Arkansas' lethal injection protocol is substantially similar to the Missouri protocol upheld in *Taylor* and "even stronger" than Kentucky's protocol upheld in *Baze*.   Plaintiffs argue that Arkansas' lethal injection protocol differs from the protocols upheld in *Taylor and Baze* because it (1) fails to prohibit a cut-down procedure; (2) permits the insertion of a central venous line by individuals who are not qualified to perform the procedure; (3) fails to prohibit intracardiac infusion; (4) causes gratuitous and unnecessary pain and suffering as demonstrated by past executions in Arkansas; (5) fails to provide for an adequately qualified IV team; (6) fails to provide for adequate facilities; (7) fails to provide for adequate monitoring of IV infusion sites; and (8) contains a potentially disastrous back-up plan.  The Court will consider each argument separately.

### 1.  Cut-Down Procedure

A newspaper article covering the execution of Rickey Ray Rector in 1992 states that Rector, who was 298 pounds and had compromised veins, moaned as he underwent numerous attempts to establish a peripheral IV line.  Before a catheter was successfully placed in a vein on the top of  Rector's right hand, the IV team attempted to gain access to a vein by performing a cut-down procedure on Rector's right arm.  Rector's post-mortem photographs show nine needle marks on his arms and hands and a two-inch wide incision on the inside of his right arm.  *See* docket entry #137, Exs. ##15-22.

Plaintiffs assert that Arkansas' protocol constitutes cruel and unusual punishment because it does not specifically preclude the possibility of using the  "brutal, medically unacceptable" cut-down procedure endured by Rector.  In *Nelson v. Campbell*, 541 U.S. 637, 124 S. Ct. 2117 (2004), the Supreme Court permitted a death row inmate to bring a § 1983 action

challenging the use of a cut-down procedure that would be applied to him because of his particular physical condition–severely compromised veins. Dr. Heath, the plaintiff's expert witness in *Nelson*, attested that the cut-down procedure is painful and dangerous and that in light of less invasive means of venous access, namely percutaneous central line placement, there is no valid reason to employ the cut-down procedure. *See Nelson*, 541 U.S. at 646, 124 S. Ct. at 2124. Dr. Heath described a cut-down procedure as making a deep incision through the skin, connective tissue, and underlying layers of fat and muscle until the region surrounding a large vein is reached. *See Nelson v. Campbell*, 286 F. Supp. 2d 1321, 1323 (M.D. Ala. 2003), *rev'd*, 541 U.S. 637, 124 S.Ct. 2117 (2004)

Plaintiffs provide no evidence that they will be subject to a cut-down procedure as described by Dr. Heath in *Nelson*. Previously, Arkansas' protocol contained a specific provision permitting a cut-down procedure to gain venous access. *See* docket entry #139, Ex. #30 (ADC Administrative Directive 05-43, Attach. C, Sec. II.8). The current protocol contains no such provision, there is no evidence that the ADC has employed a cut-down procedure since Rector's execution in 1992, and Plaintiffs do not contend that their physical conditions will present difficulties in obtaining venous access. Furthermore, the ADC's chief deputy director, Ray Hobbs, testifies that in the event that an incision is necessary in order to gain venous access, it will be made by a licensed physician and will not go through muscle tissue. Docket entry #140, Attach.

The Court finds no evidence that Arkansas' current protocol subjects them to the type of cut-down procedure at issue in *Nelson*, and apparently performed on Rector in 1992. The Court further finds that if the IV team is unable to establish a peripheral IV site percutaneously, it

17

would not amount to cruel and unusual punishment for a physician to make an incision necessary to gain access to a vein.  *See Baze*, 128 S. Ct. at 1530-31 (citing *Helling v. McKinney*, 509 U.S. 25, 33,  34-35, 113 S. Ct. 2475, explaining that to constitute cruel and unusual punishment the conditions presenting a risk must be *sure or very likely* to cause needless suffering and give rise to *sufficiently imminent* dangers).

### 2.  Qualifications of Persons Performing Central Line Placement

Plaintiffs assert that this Court must decide "whether the Constitution permits Defendants to employ a person or persons of undetermined credentials, experience, and competence to insert central lines during executions."  Docket entry #135, at 10.   Missouri's protocol, upheld in *Taylor v. Crawford*,  provides:  "Medical personnel may insert the primary IV line as a peripheral line or as a central venous line (e.g. femoral, jugular, or subclavian) provided they have appropriate training, education, and experience for that procedure."  Defs.' Resp. to Court Order of Sept. 12, 2006, Ex. A, *Taylor v. Crawford*, (W.D. Mo. 2006)(No. 05-4173-CV-C-FJG).  Arkansas' protocol similarly requires that IV team members be licensed or certified healthcare providers, such as physicians, nurses, or emergency medical technicians, with at least two years of professional experience.  The protocol further provides that if a problem develops with an infusion site and efforts to re-establish a patent infusion site fail, "trained, educated, and experienced persons necessary to establish a primary IV line as a peripheral line or as a central venous line will be summoned to facilitate an IV infusion site."  (ADC Lethal Injection Protocol, revised 05/22/08, Sec. III.i.3.).

Plaintiffs contend that the  foregoing language is "vacuous verbiage that in no way protects the condemned inmate from being subjected to butchery at the hands of incompetent

personnel." (07/30/07 Heath Dec., ¶24.)  In response to Plaintiffs' charge, Defendants submit the following affidavit testimony of ADC official Ray Hobbs:

> Days prior to the scheduled execution, the condemned inmate is examined and evaluated for possible IV infusion sites.  If it appears during that examination that it will be difficult to establish an IV line on the day of the execution, then the condemned inmate is asked to allow a central venous line to be established prior to the execution.  If the condemned inmate consents, then a licensed physician who is credentialed to establish a central venous line performs that procedure in a clinical setting before the scheduled execution.  Such advance procedures have not required the use of an incision in the past.

Docket entry #140, Attach.  Hobbs further testifies that the ADC "interprets, understands, and intends" that if it is necessary to establish a central venous line during an execution, the procedure will be conducted by a  licensed physician who possesses the necessary credentials. *Id.*  The Court finds that Arkansas' protocol adequately requires that qualified medical personnel carry out central line placement in the event that the procedure is necessary.

### 3.  Intracardiac Infusion

Plaintiffs state that Defendants have contemplated using an intracardiac infusion procedure during lethal injection executions, which they assert is an extraordinarily dangerous procedure involving the insertion of a large needle directly into heart muscle.   By affidavit, Chief Deputy Director Hobbs testifies: "an intracardiac infusion will not be performed during any further lethal injection execution carried out by the ADC."  Docket entry #140, Attach.

The current protocol contains no provision calling for intracardiac infusion, and based on Hobbs' affidavit, the Court finds that the ADC will not use the procedure in carrying out a death sentence.  Accordingly, the Court finds no genuine issues of material fact on this issue.

### 4.  Past Executions

In *Baze*, the Supreme Court noted that only one Kentucky prisoner had been executed since the Commonwealth adopted the lethal injection procedure, and no problems were reported in connection with that execution. *See Baze*, 128 S. Ct. at 528. Arkansas, however, has conducted 27 executions by lethal injection, and Plaintiffs contend that four of those executions were "botched" and "likely . . . excruciatingly and unconstitutionally torturous for the prisoner involved." (Plfs.' Resp. at 3.)

Dr. Heath acknowledges that 2 grams of sodium thiopental (1 gram less than the dose mandated by the ADC's protocol) if properly administered into the bloodstream, "would be more than sufficient to cause unconsciousness and, eventually, death, if no resuscitation efforts were made . . . ." (6/11/2006 Heath Dec. ¶ 26.) However, Dr. Health states that his research indicates that executions have occurred where the full dose of sodium thiopental listed in the protocol was not fully and properly administered.

According to Dr. Heath, witness accounts and execution records regarding the executions of Arkansas death row inmates Ronald Gene Simmons, Rickey Ray Rector, Steven Hill, and Christina Riggs "are indicative of problems with the administration of lethal drugs and raise concerns that adequate anesthesia may not be being reliably provided." (6/11/2006 Heath Dec. ¶ 48.) Dr. Heath repeats the following information from a newspaper article[5] containing a reporter's personal account of the 1990 execution of Ronald Gene Simmons, the first person to be executed in Arkansas by lethal injection:

The administration of lethal chemicals began at 9:02 p.m. Between 9:02 and 9:04

---

[5]Statements contained in newspaper articles used to prove the truth of the matter asserted are inadmissable hearsay, most likely double hearsay. However, an expert may rely upon otherwise inadmissible evidence in forming his opinion if the facts and data upon which he relies are of a type reasonably relied upon by experts in his field. *See* Fed. R. Evid. 703.

p.m. according to eyewitnesses, Mr. Simmons appeared to nod off into unconsciousness. However, at 9:05 p.m. he called out "Oh! Oh!" and began to cough as though he might be having difficulty breathing. During the next two minutes, he coughed approximately 20 times. With each cough his stomach heaved slightly and the gurney to which he was strapped shook. Mr. Simmons became still at 9:07 p.m., after which his face and arm turned first blue and then purple. An ADC employee twice appeared to adjust the IV tube in Mr. Simmons' arm, and not until 9:19 p.m. was Mr. Simmons pronounced dead by the coroner.

(6/11/2006 Heath Dec. ¶ 43.)   Docket entry #82, Ex. #5, ¶ 43.

Dr. Heath opines that Simmons's initial vocalizations and coughing were inconsistent with "the induction of a surgical plane of anesthesia by sodium thiopental." (6/11/2006 Heath Dec. ¶ 44.)   He states that the typical reaction to the administration of sodium thiopental is yawning and drawing one or two deep breaths.  (*Id.*)

Regarding the execution of Rickey Ray Rector in 1992, Dr. Heath summarizes the following "first-person account from the Associated Press" set forth in a newspaper article:

The medical team secured the tubes to Rector about 9:40 p.m. and the dark curtain opened 10 minutes later. Rector was strapped to a gurney, a white sheet covered him from his feet to his lower lip.

The murderer moved his lips, but he could not be heard through the glass. Prison officials later said Rector's last words were: "I got baptized and saved." Lockhart gave the order to begin the lethal drip about 9:50 p.m., 50 minutes behind schedule.

Rector blinked his eyes slowly. He looked like a man nodding off to sleep for about two minutes when he closed his eyes for good.

* * * *

About 9:55 p.m., Rector's lips moved rapidly–as if he was drawing shallow breaths. His lips stopped moving a minute later. He didn't move again.

At 10:06 [a witness] looked at what appeared to be a heart monitor at the head of the gurney. "It looks like it's flat-lining," he said. "Oh, there was a jump. There's another flutter."

> Two minutes later, he said, "there's not anything moving in that monitor at all. It's straight across."

Docket entry #137, Ex. #11.

John Jewell, an attorney who represented Rector and witnessed his execution, testifies by declaration that Rector's executioners had difficulty establishing an IV site, and he heard Rector telling the executioners where they could get access to a vein. Docket entry #82, Ex. 23, ¶8. Jewell states: "Even once the IV was in place, the rest of the procedure still took another ten minutes or more. . . . It was a horrible experience." *Id.*, ¶9.

Dr. Heath repeats information contained in a declaration by attorney Charles L Carpenter, who represented Steven Douglas Hill and witnessed Hill's lethal injection execution in 1992. Carpenter states his observations as follows:

> Approximately 3-5 minutes after the IV fluid began to flow, I noticed Stephen struggling to breathe. He was strapped down, but his chest was heaving against the wide belt that covered his chest. He appeared to be gasping for air. Within another minute, he turned a bright red color and then lay completely still. It was another 2-3 minutes before he was pronounced dead.

Docket entry #82, Ex. #6, ¶8. Plaintiffs also submit a copy of a newspaper article about Hill's execution with a headline that reads: "This time, execution goes smoothly." Docket entry #82, Ex. #7.

As for the 2000 execution of Christina Riggs, Dr. Heath states that the procedure was delayed for 18 minutes while ADC personnel "struggled" to insert the IV line into her elbows. (06/11/07 Heath Dec., ¶ 47.) He states that "a minute after the drugs had purportedly begun to flow into her body, Mr. Riggs was still vocalizing. Witnesses heard her say, "I love you my babies." (06/11/07 Heath Dec., ¶ 47.).

According to Dr. Heath, the preceding record of past executions in Arkansas "provide

evidence that is indicative of continued consciousness following the purported administration of sodium pentothal."  (06/11/07 Heath Dec., ¶ 42.)  Even assuming that Simmons, Rector, Hill, and Riggs were conscious for more than one minute after the administration of sodium thiopental began, the record contains no evidence to support Plaintiffs' theory that Arkansas' current protocol subjects them to a  substantial risk that they will be conscious during the administration of pancuronium bromide and potassium chloride.

The record contains no evidence regarding the rate at which lethal chemicals were injected during past executions or when the last two chemicals were administered.  Furthermore, unlike the protocols in place when the so-called "botched" executions took place, the ADC's current protocol specifically requires that the last two chemicals are administered only after the Deputy Director determines that the inmate is unconscious and three minutes have passed from the time that administration of sodium thiopental begins. *Compare* docket entry #21, Ex. #1 (ADC Administrative Directive dated 05/23/1996, Attach. C) *and* docket entry #138, Ex. #30 (ADC Administrative Directive dated 11/23/05, Attach. C) *with* docket entry #129, Ex. A (ADC Lethal Injection Protocol, Revised May 22, 2008).

The Court finds that the evidence presented regarding lethal injection executions that occurred in the past fails to demonstrate that Arkansas' current protocol exposes Plaintiffs to an objectively intolerable risk of pain.  See *Baze*, 128 S. Ct. at 1537(citing *Farmer v. Brennan*, 511 U.S. 825, 826 and n.9, 114 S. Ct. 1970)(stating that what the Eighth  Amendment prohibits is wanton exposure to objectively intolerable risk, not simply the possibility of pain).

### 5. IV Team Qualifications

Plaintiffs assert that "members of the IV Team in Arkansas are not required to have qualifications and experience that even approach those of the IV team members in Kentucky."

Docket entry #135, at 20.[6]   Like Kentucky's protocol, Arkansas' requires that IV team members

be certified or licensed EMT's, nurses, physician assistants, or physicians.  Furthermore,

Kentucky's protocol requires that IV team members have one year of professional experience,

and Arkansas requires at least two years of professional experience.   Despite these similarities,

Plaintiffs assert that Arkansas' protocol falls short because it contains no specific requirement

that IV team members have experience placing and monitoring  IV catheters.

In *Taylor*, the Eighth Circuit held that Missouri's protocol adequately requires that

trained medical personnel carry out each medial step of the lethal injection procedure.  *See*

*Taylor*, 487 F.3d at 1084.  Similar to Arkansas' protocol, Missouri's requires that only a

physician, nurse, or emergency medical technician insert intravenous lines, and it contains no

specific training guidelines for members of the execution team.   The Court finds that the

absence of language requiring specific training and practice for members of the IV team does not

render Arkansas' execution procedure cruel and unusual.   *See Taylor*, 487 F.3d at 1084("Absent

some specific disqualifying characteristic of the chosen medical personnel, we would be hard

pressed to say that a physician, a trained nurse, or a licensed pharmacist is not qualified to mix

the chemicals.")

### 6. Facilities

---

[6]Plaintiffs also complain that the IV team is led and supervised by a less-than-qualified Deputy Director.  Arkansas' protocol charges the Deputy Director or his designee with several tasks, including monitoring the inmate's lack of consciousness.   However, the Deputy Director is not a member of the IV team. Additionally, the protocol requires that the "the Deputy Director, or the designee, shall be healthcare trained, educated, and/or experienced in matters related to the establishment and monitoring of IVs, the mixing and administration of lethal chemicals, and assessing the presence and assessing the presence or absence of consciousness." (ADC Lethal Injection Procedure, Revised 05/22/08, Sec. I(1).)

Plaintiffs contend that Arkansas' execution chamber is "poorly designed and inadequately lit, and the physical apparatus used by the executioners to administer the lethal drugs is so likely to result in the drugs being administered in the wrong order and other errors as to render its use reckless."  Docket entry #135, at 22.  Plaintiffs' specific criticisms of the facilities are that the placement of the execution gurney will not enable executioners to see problems that develop in the IV infusion sites or any signs that the prisoner is inadequately anesthetized; the execution chamber is too small; the lighting in the injection room is dim, which hinders the executioner's view of syringes; and the syringes are inadequately labeled.[7]

Plaintiffs provide no evidence that Arkansas' execution facilities subject them to a substantial or objectively intolerable risk of serious harm.  *See Baze*, 128 S. Ct. at 1537(stating that risks suggested by petitioners, such as improper mixing of chemicals, cannot remotely be characterized as "objectively intolerable".)  The Eighth Amendment does not require medically optimal facilities, and the Court finds that Arkansas' protocol contains adequate safeguards that make up for the physical separation of the condemned inmate and the executioners and other alleged imperfections.

### 7.  **Monitoring of IV Infusion Sites**

Plaintiffs maintain that the current ADC protocol "allows for no monitoring of the IV sites during the execution because those sites, along with the rest of the inmate's body with the exception of his head, are completely covered with a sheet for the duration of the process."  Docket entry #135, at 25.  According to Plaintiffs, the protocol "fails to guarantee that the

---

[7]The written protocol provides that the syringes are labeled #1 through #8, denoting the order in which the syringes are administered.  The protocol specifically requires that the mixed chemicals be transferred to the appropriate syringe as set forth in Section IV of the protocol.

Deputy Director or designee will do anything more than occasionally lift the corner of the sheet to look at the IV sites, if that." *Id.*

Contrary to Plaintiffs' assertion, the protocol specifically instructs: "Throughout the lethal chemical infusion process, the Deputy Director, or designee, will closely monitor the infusion site for evidence of infiltrate, vein collapse, or other challenge to the patency of the infusion site." (ADC Lethal Injection Procedure, Revised 05/22/08, Sec. III.2.i.).

In support of the charge that the Deputy Director will shirk his duty to closely monitor the infusion site, Plaintiffs submit a *post-mortem* photograph of Steven Hill, showing his lifeless body covered by a sheet. The Court finds that the photograph provides no evidence that Defendants will deviate from the monitoring procedures mandated by the written protocol. The Court finds that Arkansas' requirement that the Deputy Director closely monitor the infusion site sufficiently addresses the risk of IV problems that might develop during the lethal injection procedure.[8]

### 8. Back-Up Plan

Plaintiffs assert that the protocol presents a substantial risk that a terrible series of events will occur because it does not require a second dose of sodium thiopental "when the decision is made to redirect the flow to the backup IV site mid-execution." Docket entry #135, at 27. Plaintiffs envision the following chain of events:

> If the prisoner receives enough of the drug to render him temporarily unconscious, the execution will appear to be going smoothly when Defendant Byus performs his rudimentary consciousness checks, although in fact the dose that the inmate has

---

[8]The Kentucky protocol approved in *Baze* provides that the warden and deputy warden will watch for signs of IV problems, including infiltration. *See Baze*, 128 S. Ct. 1534. Chief Justice Roberts noted that three experts had testified that identifying signs of infiltration would be very obvious even to the average person. *Id.*.

received is insufficient to achieve a surgical plane of anesthesia and to ensure that it is maintained through the duration of the execution. If the problem that has been developing with the IV site is thereafter discovered and the flow of the remaining two chemicals is diverted to the back up site, the prisoner will receive full doses of pancuronium bromide and potassium chloride following only a partial, inadequate dose of anesthesia.

Docket entry #136, at 27.

The record does not support a finding that the foregoing scenario is even possible. First, the written protocol provides that if the Deputy Director or his designee determines that the inmate remains conscious after the administration of sodium thiopental, the back-up syringes of sodium thiopental "shall be administered into the secondary or alternative IV line." (ADC Lethal Injection Procedure, Revised 05/22/08, Sec. II.8.) Second, the protocol provides that if a problem is suspected with the primary IV site, the Deputy Director will direct reduction of the chemical flow rate or redirect "*lethal chemical* to the secondary or alternative site." (ADC Lethal Injection Procedure, Revised 05/22/08, Sec. III.2.i(1)(emphasis added)). Chief Deputy Director Hobbs testifies: "The ADC interprets, understands, and intends for the term 'lethal chemical' to include the backup doses of the first lethal chemical [sodium thiopental], as well as the extra saline flush. Therefore, Section III.2.i(1) requires the back up syringes of sodium [thiopental] and saline flush to be administered before the administration of any remaining pancuronium bromide and potassium chloride." Docket entry #140, Attach.

In light of Hobbs' testimony, the Court finds no support for Plaintiffs' claim that "the protocol does not direct the administration of a second dose of anesthetic when the decision is made to redirect the flow to the backup IV site mid-execution."

In conclusion, the Court finds that Arkansas' lethal injection protocol is substantially similar to the protocols approved in *Taylor* and *Baze*. The Court further finds that Plaintiffs

have failed to come forward with evidence that Arkansas' protocol for execution by lethal injection subjects them to a constitutionally significant risk of pain.  Accordingly, Defendants are entitled to summary judgment.

**IV.**

Given the Court's decision that Defendants are entitled to summary judgment, Davis has no reasonable likelihood of success on the merits of his claim.[9]  Additionally, as previously stated, the Eighth Circuit has ruled that Davis unjustifiably delayed bringing his claim under § 1983, and that alone disqualifies him for a stay of execution.  Accordingly, the Court will grant Defendants' motion to lift the stay of execution of Davis's death sentence.

IT IS THEREFORE ORDERED that Defendants' motion for summary judgment (docket entry #128) is GRANTED.

IT IS FURTHER ORDERED that Defendants' motion to dissolve Don William Davis's stay of execution (docket entry #131) is GRANTED.  The stay of execution granted by the Eighth Circuit as to Plaintiff Jones and the stay of execution granted by Chief Judge Holmes as to Plaintiff Nooner are still in place.

---

[9]The factors to consider when deciding whether to grant or deny a motion for a preliminary injunction include: (1) the threat of irreparable harm to the movant; (2) the state of the balance between the movant's harm and the injury that granting the injunction will inflict on other parties involved in the litigation; (3) the probability the movant will succeed on the merits; and (4) the public interest. *See Dataphase Sys., Inc. v. CL Sys.*, 640 F.2d 109, 113 (8th Cir. 1981). Additionally, a court considering a stay of execution must apply "'a strong equitable presumption against the grant of a stay where a claim could have been brought at such a time as to allow consideration of the merits without requiring an entry of a stay.'"  *Hill v. McDonough*, 126 S. Ct. at 2104(quoting *Nelson v. Campbell,* 124 S. Ct. 2117, 2126 (2004)).

IT IS SO ORDERED THIS 5TH DAY OF AUGUST, 2008.


/s/Susan Webber Wright
UNITED STATES DISTRICT JUDGE